UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Alice Price,　　　　　　　　　　　　　　Civ. No. 08-CV-1313 (ADM/JJG)

　　　　Plaintiff,

v.　　　　　　　　　　　　　　　　　　**REPORT AND RECOMMENDATION**

**Michael J. Astrue,**
Commissioner of Social Security,

　　　　Defendant.

---

JEANNE J. GRAHAM, United States Magistrate Judge

　　Plaintiff Alice Price (Price) brings this action contesting the denial of her applications for disability insurance benefits (DIB) and supplemental security income (SSI) under the Social Security Act. *See* 42 U.S.C. § 405(g); 42 U.S.C. §1383(c)(3). Price is represented by Dennis L. Peterson, Esq. The Commissioner is represented by Lonnie F. Bryan, Assistant U.S. Attorney. The parties bring cross-motions for summary judgment, (Doc. Nos. 8, 19), which are referred to the undersigned for a report and recommendation in accordance with 28 U.S.C. § 636 and D.Minn. L.R. 72.1(a). For the reasons set forth below, the Court recommends that Plaintiff's motion be granted in part and denied in part, Defendant's motion be denied, and the case be remanded to the agency for further proceedings consistent with this recommendation.

## I. BACKGROUND

### A. Administrative Review

　　Price is 42 years old. (Tr. 74.) She had been employed as a school bus driver, but did not return to work after attempting suicide in November 2004. (Tr. 153, 449, 140.)

In a Disability Report, Price said she is in constant pain from migraines and hemorrhaging, and was also dealing with severe harassment at work. (Tr. 140.) Price applied for DIB and SSI on April 15, 2005. (Tr. 74-78, 95-97.) Her benefits applications were denied initially, and upon reconsideration. (Tr. 23-26, 48-51, 54-59, 86-94.) In a pre-hearing memorandum, Price's counsel noted that Price suffered from a delusional disorder at the time she attempted suicide, and her medical records indicated ongoing paranoia. (Tr. 154-56.)

Price requested a hearing before an administrative law judge (ALJ), which was held on July 26, 2007. (Tr. 44, 444.) Price testified that she lived alone, and her children were adults. (Tr. 449.) She testified that her job as a bus driver ended because she was being harassed. (Tr. 455.) She described that there were individuals who would cut in front of the bus, and just stop and look at her. (Tr. 455.) She also described individuals hanging out at bus stops making her feel like she was going to be attacked. (Tr. 455.) She said there were incidents where she was almost run over by vehicles, and although she reported it, she didn't get any help. (Tr. 455.)

As to her physical health, Plaintiff testified that when she was working, she had migraines every day. (Tr. 456.) At the time of the hearing, her headaches were down to about four to six days a month. (Tr. 456.) Medications helped her headaches, but made her sleepy. (Tr. 456.) Price also testified that since she left her job, the individuals who had been stalking her were now just monitoring her coming and going. (Tr. 457.) She believed they were monitoring her since she moved to Minneapolis from Gary, Indiana. (Tr. 458.)

Price admitted having panic attacks, which occur when she feels threatened. (Tr. 459-60.) She also testified to having thoughts of suicide and low spells, which happen mainly when she is menstruating. (Tr. 461.) On those days, all she wants to do is sleep. (Tr. 461.)

On October 23, 2007, the ALJ denied Price's applications for benefits, finding her able to perform medium, unskilled work, with no more than brief and superficial contact with the public, coworkers, and supervisors, and no rapid or frequent changes in work routine. (Tr. 10, 17, 22.) The ALJ concluded that Price's testimony regarding the severity of her symptoms was not entirely credible. (Tr. 18.) In support of this finding, the ALJ noted that Price had a significant reduction in headaches when compliant with medication. (Tr. 18.) He also noted that her use of ice, rather than medication, was conservative treatment inconsistent with her allegations of the severity of her pain. (Tr. 18.)

The ALJ recognized Price's history of dysfunctional uterine bleeding, but noted that it was surgically treated in September 2004, and required no further treatment. (Tr. 18-19.) However, he also recognized that Price continued to have headaches associated with heavy menses. (Tr. 18.)

The ALJ found Price to be severely impaired by schizoaffective disorder with depression and anxiety, resulting in moderate functional limitations. (Tr. 19.) He discounted Price's credibility because she refused medication for delusions, and because treatment with Prozac[1] made her feel calm and reduced her panic attacks. (Tr. 19.) The ALJ noted that Price did not report side effects from taking Prozac and Midrin. (Tr. 19.)

---

[1] The record indicates that Price was treated with Paxil, not Prozac. (Tr. 199, 204, 210, 311, 313, 317, 323, 334.)

He found that Price is independent in self care, lives alone, drives, shops with a friend, and goes alone to medical appointments. (Tr. 19.) The ALJ concluded that Price's allegation that "there are days at a time" when she does not get out of bed is not substantiated "by the weight of the evidence of record." (Tr. 19.)

Furthermore, the ALJ found Price's work history to negatively affect her credibility, because she had a poor record of sporadic employment with no rehabilitation training. (Tr. 19.) He also noted that she was able to work before the alleged onset of disability, despite the same impairments and symptoms. (Tr. 19.)

The ALJ also considered the various medical opinions, and gave significant weight to the opinions of Dr. Karayusuf, an examining source, and the State agency medical consultants. (Tr. 19.) The ALJ considered, but did not give controlling weight to the opinion of Dr. Newman, a treating source. (Tr. 20.) Dr. Newman opined that the severity of Price's symptoms would require Price to take unscheduled breaks and to miss more than three days of work per month. (Tr. 20.) The ALJ found this to be inconsistent with "neurological records which document a level of frequency or severity that would result in an absentee rate of no more than two days per month." (Tr. 20.) The ALJ also gave significant weight to the opinion of Dr. Patrick, a neurologist, who opined that Price would need a break from work when experiencing a headache, "at the most four hours once a month." (Tr. 20.) The ALJ also credited Dr. Patrick's opinion that Price would not require unscheduled breaks, and would be expected to miss work about once a month. (Tr. 20.) Based on the testimony of the vocational expert, the ALJ concluded that while Price was unable to perform her past relevant work as a school bus driver, she was able to

perform other work that exists in significant numbers in the national economy. (Tr. 20-22.) The Appeals Council denied Plaintiff's request for review. (Tr. 5-8.)

### B. Medical Records

In the first half of 2004, Price was treated for asthma, chest pain, migraines, uterine bleeding, and anemia by Dr. Nancy Newman at the Hennepin County Family Medical Center ("HCMC"). (Tr. 216, 218-20.) In July, Price reported having headaches two to three times a month, but that Midrin worked well to alleviate the headaches. (Tr. 216.) Price's anemia was resolved in July, but she continued to complain of heavy uterine bleeding that sometimes caused her to miss work. (Tr. 216.) In hopes of reducing this problem, she underwent hysteroscopy, dilatation and curettage (D&C) with polypectomy and endometrial ablation on September 14, 2004. (Tr. 211-12.) In a post-operative visit, Price said her pain was much improved, and she was pleased with the results. (Tr. 211.)

Price's employer required her to have a physical examination in November 2004. (Tr. 283.) Upon examination, she reported being very stressed and harassed at work. (Tr. 283.) Dr. Newman noted that she once again referred Price to a counselor. (Tr. 283.)

Several weeks later Price was hospitalized at HCMC after making "a serious suicide attempt by overdose (and wrist cutting)." (Tr. 158.) When interviewed, Price appeared paranoid, with long-standing delusional beliefs about being harassed and stalked. (Tr. 159.) Dr. Nicholas Rogers noted that Price appeared anxious, and she said she was too stressed to return to work. (Tr. 159.) On discharge, Dr. Rogers diagnosed Price with delusional disorder. (Tr. 160.)

After her hospitalization, Price saw Dr. Newman for abdominal pain with nausea and vomiting. (Tr. 209.) Dr. Newman's differential diagnoses included anxiety, likely paranoid, migraine, recent Tylenol overdose, and GERD. (Tr. 210.) She prescribed Paxil, Midrin, and Pepcid. (Tr. 210.)

When Price saw Dr. Newman on December, 10, 2004, she said that she attempted suicide because she was being harassed and stalked at work. (Tr. 205.) Dr. Newman noted, "[s]he has always refused to take antidepressants and refused counseling referrals in the past from me." (Tr. 205.) Price appeared depressed and anxious, and complained of headaches. (Tr. 205.) Five days later, Price complained of constipation and sleep disruption from taking Paxil. (Tr. 204.) She was sleeping from 7 a.m. to 3 p.m. during the day. (Tr. 204.) Price was preoccupied with anxieties, but stated she did not want to see anyone other than Dr. Newman for help. (Tr. 204.)

Price continued to have physical problems in January 2005. She complained of nausea and extreme vertigo, associated with back spasms and mild abdominal cramping. (Tr. 199.) Paxil had reduced her anxiety. (Tr. 199.) Dr. Newman noted that Price was afraid to be medicated "to take the stalkers away" because she believed they were real, and it would be dangerous not to notice them. (Tr. 199.) The next month, Price wanted to know if she could take something for anxiety episodes and chest pain. (Tr. 191.) In June, Price's symptoms were stomach pain, occasional vomiting, and depression with occasional thoughts of suicide. (Tr. 178-79.)

Price underwent a psychiatric consultative examination with Dr. Alford Karayusuf of Minnesota Social Security Disability Determination Services on August 22, 2005. (Tr. 170-72.) Her chief complaints were menstrual hemorrhaging and chronic

6

migraines, but she also reported being depressed her whole life, with a history of abuse. (Tr. 170-71.) She complained of a diminished appetite, and sometimes sleeping two or three days in a row, and then being unable to sleep two days in a row. (Tr. 171.) She reported being in bed twenty hours a day with no desire to do anything. (Tr. 172.)

Price indicated that her job as a school bus driver lasted two and half years, and she was being followed the entire time. (Tr. 171.) At that time, she was living with her eighteen-year-old son, and her two older sons had little contact with her. (Tr. 171.)

On mental status examination, Price was oriented and had fair immediate recall. (Tr. 172.) She did not report hallucinations, but Dr. Karayusuf noted that she was delusional, and was convinced that people continued to follow her. (Tr. 172.) He found her insight to be minimal, and he diagnosed schizoaffective disorder. (Tr. 172.) Dr. Karayusuf concluded that Price was able to understand, retain, and follow simple instructions, but was restricted to brief, superficial interactions with fellow workers, supervisors, and the public. (Tr. 173.) Within those parameters, he opined that Price could perform simple, routine, repetitive, concrete, tangible tasks, and maintain persistence and pace. (Tr. 173.) Dr. James Alsdurf, a consulting psychologist, reviewed Price's social security file in September, and essentially agreed with Dr. Karayusuf's opinion. (Tr. 228-42, 248-50.)

By the end of 2005, Price reported that her migraines occurred two to three times a week, and were relieved by Midrin. (Tr. 278.) The following month, Price turned down a new medication for her migraines. (Tr. 275.) She also reported continued chest pain. (Tr. 275.) In April 2006, her chest pain continued, accompanied with panic when walking. (Tr. 271.)

Dr. Newman completed a Headaches Residual Functional Capacity Questionnaire ("RFC") on Price's behalf in May. (Tr. 258-62.) She noted that she had been treating Price for eight years. (Tr. 258.) Dr. Newman diagnosed Price with headaches, mixed versus migraine, asthma, depression/anxiety, and dysfunctional uterine bleeding. (Tr. 258.) She noted that Price had severe headaches at least once a week, with vertigo, nausea, vomiting, malaise, photosensitivity, mood changes and mental confusion, and that her headaches lasted two or three days. (Tr. 258.) She also noted that the medication Midrin caused dizziness and nausea. (Tr. 260.) Dr. Newman opined that Price would need unscheduled breaks from work once a week for fifteen to twenty minutes. (Tr. 261.) She opined that Price was capable of a low stress job, but depression and anxiety would cause even a low stress job to be stressful for Price. (Tr. 261.) Dr. Newman opined that Price would miss work three times a month, based on her experience at her last job. (Tr. 261.)

Dr. Newman referred Price to a neurologist, Dr. Barbara Patrick, to evaluate her headaches. (Tr. 302.) Price saw Dr. Patrick in July 2006, and described having headaches since age six. (Tr. 301-02.) Price told Dr. Patrick that she had headaches before, during, and after menses, for a total of ten days. (Tr. 302.) Additionally, she had migraines once a week, lasting for hours, which were exacerbated by sleep deprivation and stress. (Tr. 302.) Price reported that Midrin provided some relief for the headaches she had with her menses, and ice and sleep helped her headaches that were unrelated to menses. (Tr. 302.) She also reported neck and back pain associated with headaches. (Tr. 302.) Dr. Patrick recommended that Price start taking Verapamil for prophylactic therapy, and Midrin as needed. (Tr. 302-03.) The next month, Price requested a change

in medication because Verapamil caused constipation, and Dr. Patrick prescribed Nortriptyline (Tr. 301.)

Price was sent by a social worker to Dr. Robert Werner at Hennepin Faculty Associates for a psychiatric examination, and to assist her by completing certain forms. (Tr. 333.) On September 22, 2006, Dr. Werner noted that Price "first came to our psychiatric attention in November 2004 when she was admitted to our Inpatient Psychiatry Unit following a very serious suicide attempt." (Tr. 333.) He noted that Price felt she was being harassed beginning several years before her suicide attempt. (Tr. 333.) It started with people observing her, staring, and making faces. (Tr. 333.) If she ignored the harassment, it escalated to shoving, chasing, and locking bathrooms so she could not use them. (Tr. 333.) She said her suicide attempt was to escape the harassment. (Tr. 333.) Dr. Werner noted that Price refused psychotropic medication while an inpatient after her suicide attempt, but was now taking Paxil, "which in some vague way has brought her some mild relief." (Tr. 333.) Price reported staying in the house most of the time, for fear of being harassed outside. (Tr. 334.)

Upon mental status examination, Dr. Werner found Price to relate with warmth, good eye contact, and appropriate smiles. (Tr. 334.) She did not appear to be particularly guarded, and her speech was normally organized, with no evidence of hallucinations. (Tr. 334.) However, she described complex delusions about being harassed. (Tr. 334.) Dr. Werner diagnosed delusional disorder, and prescribed Geodon.[2] (Tr. 334.) After talking to Dr. Newman, Price still refused to take Geodon. (Tr. 344.)

---

[2] Geodon is used in the treatment of schizophrenia, and is believed to work by opposing the action of serontin and dopamine. It is typically only prescribed after other drugs prove inadequate due to potentially serious side effects, such as heartbeat irregularities. PDR DRUG GUIDE FOR MENTAL HEALTH PROFESSIONALS at 77-78 (2nd ed. Thomson PDR 2004).

9

On her next visit to Dr. Newman in November, Price wrote Dr. Newman a note in which she reported having eight headaches related to her last menses. (Tr. 422.) She also wrote that she wanted to challenge the words "delusional and paranoid" in her medical history. (Tr. 422.)

Dr. Newman referred Price to a social worker, Diane Jorgenson, whom Price met with in January 2007. (Tr. 324-28.) Price reported that she rarely leaves her home alone, but explained that she could go to the Family Medical Center at HCMC because she was familiar with it. (Tr. 324.) She also reported being upset that no one believed her about being harassed. (Tr. 326.) She said that she had long planned to kill herself when her children were grown up. (Tr. 326.) Ms. Jorgensen recommended that Price speak to Dr. Newman about a referral to Dr. Ekern. (Tr. 328.)

Later that month, Price saw Dr. Patrick in follow-up, and reported that she never filled the prescription for Nortriptyline. (Tr. 323-24.) She said she averaged ten days of headaches a month around the time of her menses, and that she treated herself with ice, Midrin, and going to bed. (Tr. 323.) Price wanted to try Verapamil again, but at a lower dose to avoid the side effects. (Tr. 323.) Several months after she restarted Verapamil, her headaches were much improved. (Tr. 314.) However, Dr. Patrick noted that Price generally was treating her headaches with ice, although she knew taking medication at the onset had the best results. (Tr. 314.)

Price was referred to Dr. Michael Ekern for a psychiatric diagnostic assessment in March. (Tr. 315-19.) Dr. Ekern noted that, although Price did not realize it, "it seems as though she has frank delusional paranoia," and "[m]ost prominent now is paranoia and not wanting to go outside because of it." (Tr. 316.) On mental status examination,

10

Dr. Ekern found Price to be pleasant, with fairly good eye contact, normal speech and associations, with passive thoughts of suicide. (Tr. 318.) He opined that "[her] anxiety is certainly influenced by her paranoid fears." (Tr. 318.) He found her insight to be limited, and her "judgment for every day concerns may be okay, but paranoid fears limit her." (Tr. 318.) She was attentive, oriented, and had normal recent memory. (Tr. 318.) Dr. Ekern diagnosed schizoaffective disorder, depressed type and prescribed Abilify.[3] (Tr. 318.)

In follow-up, Price said she did not start Abilify because she was "afraid of those medicines." (Tr. 313.) On mental status examination, Price had good eye contact, coherent thought, and normal associations, but some anxious fear related to paranoid thoughts. (Tr. 313.) Dr. Ekern again opined that Price's judgment may be influenced by her paranoid fear. (Tr. 313.) In April, Dr. Newman noted Price was still scared of trying medication for schizoaffective disorder. (Tr. 375.)

Price saw Dr. Patrick for her headaches again in June, and reported continued improvement with Verapamil, with no side effects. (Tr. 311.) Dr. Patrick noted that with an increase in Paxil, Price's panic attacks had decreased. (Tr. 311.) Price also reported spending a good deal of time sleeping at home. (Tr. 311.)

Dr. Patrick completed a Headache RFC Questionnaire on Price's behalf. (Tr. 427-30.) She diagnosed Price with menstrual migraines, malaise, photosensitivity, with emotional factors somewhat contributing to the severity. (Tr. 427-48.) Dr. Patrick opined Price would need a break from work, at most, four hours once a month, and would

---

[3] Abilify is used in the treatment of schizophrenia, and is thought to work by modifying the sensitivity to two of the brain's chief chemical messengers, serontin and dopamine. Notably, it can cause tardive dyskinesia, which may be permanent. PDR DRUG GUIDE FOR MENTAL HEALTH PROFESSIONALS at 1 (2nd ed. Thomson PDR 2004).

11

be absent from work once a month from illness. (Tr. 429.) She opined that Price's work issues related more to her psychiatric history. (Tr. 430.)

## II. LEGAL STANDARD

To determine the existence and extent of a claimant's disability, the ALJ must follow a five-step sequential analysis, requiring the ALJ to make a series of factual findings regarding the claimant's work history, impairment, residual functional capacity, past work, age, education and work experience. *See* 20 C.F.R. §§ 404.1520, 416.920. The Court should affirm the ALJ's decision if it is supported by substantial evidence. 42 U.S.C. § 405(g); *Parsons v. Heckler*, 739 F.2d 1334, 1339 (8th Cir. 1984). Substantial evidence is "relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Smith v. Schweiker*, 728 F.2d 1158, 1162 (8th Cir. 1984)). The Court must review the record for evidence that supports, and evidence that detracts from the ALJ's decision. *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987). The Court should not reverse the Commissioner's finding merely because evidence may exist to support the opposite conclusion. *Mitchell v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994). The duty of deciding questions of fact, including credibility, rests with the Commissioner, and the Court should normally defer to the ALJ's credibility determination if the ALJ gave good reasons for discrediting the claimant's testimony. *Gregg v. Barnhart*, 354 F.3d 710, 714 (8th Cir. 2003).

## III. ANALYSIS

First, Price alleges the record does not provide a sufficient basis for the ALJ's residual functional capacity finding concerning her mental illness, and the ALJ should have contacted her treating sources for more information or sent her for another

consultative examination. Second, Price contends the ALJ failed to give proper weight to Dr. Newman's opinion regarding her headaches. Third, Price asserts the ALJ's credibility analysis was faulty, and the hypothetical question to the vocational expert did not include her testimony regarding her headaches and other symptoms.

### A. Whether the Record of Mental Illness Was Sufficiently Developed

Price notes that she received care for mental illness from her family doctor, and although she has seen several psychiatrists, she does not maintain consistent contact with them because she does not want to take the medication they have prescribed to treat delusions. Price points out that the consultative examiner, Dr. Karayusuf, only performed a mini mental status examination, and he did not review all of the medical records. Price contends the ALJ had a duty to either contact her treating physician for a functional assessment, or order a second consultative examination for a thorough and current evaluation of her condition. Price also points out that there is no opinion in the record, based on any medical evaluation after August 2005, as to whether she met or equaled a listed impairment.

The ALJ has a duty to fully and fairly develop the record. *Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004). The ALJ should recontact a medical source if the evidence the Commissioner receives from a treating physician, psychologist, or other medical source is inadequate for making a disability determination. 20 C.F.R. § 404.1512(e). If the information needed is not readily available from the claimant's medical treatment source, the ALJ should request a consultative examination. 20 C.F.R. § 404.1512(f).

An ALJ need only obtain an updated medical opinion on the issue of equivalence with a listed impairment under certain conditions set forth in Social Security Ruling (SSR) 96-6p. *Jones ex rel Morris v. Barnhart*, 315 F.3d 974, 978-79 (8th Cir. 2003). Those circumstances are: (1) "when no additional medical evidence is received, but in the opinion of the administrative law judge or the Appeals Council the symptoms, signs, and laboratory findings reported in the case record suggest that a judgment of equivalence may be reasonable;" or (2) "when additional medical evidence is received that in the opinion of the administrative law judge or the Appeals Council may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments." Social Security Ruling 96-6p, 61 FR 344-66-01, 1996 WL 362203 (F.R.)

The ALJ fulfilled his obligation to develop the record by ordering the consultative examination with Dr. Karayusuf. The ALJ relied on the opinions of Dr. Karayusuf and the State agency medical consultants in evaluating Price's mental residual functional capacity. (Tr. 19.) There was sufficient medical evidence in the record regarding Price's mental condition to support the ALJ's determination that Price did not meet or equal a listed impairment, and the ALJ was not required to further develop the record because the conditions of SSR 96-6p were not met. However, the Court agrees that the record as whole, including the treatment records of Dr. Werner and Dr. Ekern, both of whom evaluated Plaintiff after Dr. Karayusuf's examination, does not support the ALJ's mental RFC finding. This will be addressed below in the context of the ALJ's credibility analysis.

### B. Weighing the Medical Opinions

Price contends the ALJ failed to give Dr. Newman's opinion about her headaches substantial weight, because the ALJ wrongly concluded that Dr. Newman's opinion was inconsistent with Dr. Patrick's opinion. Medical opinions are evaluated under the framework described in 20 C.F.R. § 404.1527. In according weight to medical opinions, the ALJ should consider the following factors: (1) the length of the treatment relationship; (2) the nature and extent of the treatment relationship; (3) the quantity of evidence in support of the opinion; (4) the consistency of the opinion with the record as a whole; and (5) whether the treating physician is also a specialist. 20 C.F.R. § 404.1527(d). "The Commissioner defers to a treating physician's medical opinions about the nature and severity of an applicant's impairments, including symptoms, diagnosis, and prognosis, what an applicant is capable of doing despite the impairment, and the resulting restrictions." *Ellis v. Barnhart*, 392 F.3d 988, 995 (8th Cir. 2005) (citing 20 C.F.R. 404.1527(a)(2)). "Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative decision reserved to the Commissioner." *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007).

Dr. Newman had been Price's treating physician for eight years at the time she completed a headache questionnaire on Price's behalf on May 19, 2006. (Tr. 258.) Dr. Patrick is a neurologist whom Price saw a number of times in consultation, and for treatment of her headaches beginning in July 2006. (Tr. 301.) Dr. Patrick completed a headache questionnaire for Price about a year after Dr. Newman completed the same questionnaire. (Tr. 427.) The difference in their responses to the questionnaire is easily explained, each doctor was describing Price's condition at a different time, under different

15

conditions. Dr. Newman's opinion reflects Price's condition beginning before her onset date,[4] up until Price's treatment with Dr. Patrick. Dr. Patrick's opinion reflects Price's subsequent treatment with the drug Verapamil, which was effective in reducing the frequency of her headaches.

The ALJ ignored this reality, thus, he erred in granting greater weight to Dr. Patrick's opinion and simply discounting Dr. Newman's opinion. The ALJ should have considered these opinions in the proper context of the record as whole. In other words, the ALJ should have recognized that Price's headaches improved over time. The ALJ should have considered whether Price's headaches resulted in disability for a closed period of time, until her headaches were effectively treated with Verapamil. *See Van Horn v. Heckler*, 717 F.2d 1196, 1200 (8th Cir. 1983) (stating disability is not an all or nothing proposition, ALJ should have considered a closed period of disability); *Lubinski v. Sullivan*, 952 F.2d 214, 219 (8th Cir. 1991). This does not end the analysis, because Price alleges another error in the ALJ's decision.

### C. Whether the Credibility Analysis Was Proper

Price contends the ALJ made a number of errors in his credibility analysis. First, Price contends the ALJ incorrectly stated that she reported no side effects from her medications. Second, she challenges the ALJ's determination that her lack of psychiatric care negatively affects her credibility. Price notes that her treatment records show she has little insight into her delusions, which explains why she does not want treatment for this disorder.

---

[4] For example, Dr. Newman opined that based on Price's last job, which ended in November 2004, she would miss three days of work a month due to her headaches.

Third, Price contends her daily activities are not inconsistent with her testimony, because her ability to function at home does not necessarily translate into the ability to work outside the home. Price also attacks the ALJ's finding that her ability to work with her impairments in the past suggests that she merely lacks motivation to work now. Price notes she attempted suicide, as she could no longer handle the perceived harassment and stalking that occurred when she last worked.

Fourth, Price challenges the ALJ's determination that the record does not substantiate her testimony that there are days when she does not get out of bed. Fifth, Price contends the ALJ failed to consider her feelings of being stalked outside of her home, the impact of stress on her symptoms, or precipitating or aggravating factors.

An ALJ may not disregard subjective complaints by a claimant, even where those complaints are not fully supported by objective medical evidence. *Melton v. Apfel*, 181 F.3d 939, 941 (8th Cir. 1999). Where the subjective complaints are inconsistent with medical evidence and the record as a whole, however, an ALJ has good cause to find that the claimant is not credible. *Baker v. Barnhart*, 457 F.3d 882, 892-93 (8th Cir. 2006); *Goff v. Barnhart*, 421 F.3d 785, 792 (8th Cir. 2005).

When determining whether subjective complaints of pain comport with the record, at least five factors must be considered. *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). The five factors are: the claimant's daily activities; the duration, frequency and intensity of the pain; precipitating and aggravating factors; the dosage, effectiveness, and side effects of medication; and whether the pain causes functional restrictions. *Travis v. Astrue*, 477 F.3d 1037, 1042 (8th Cir. 2007). The claimant's work history is another factor that is frequently considered. *Wheeler v. Apfel*, 224 F.3d 891,

895 (8th Cir. 2000). The *Polaski* factors also apply in evaluating subjective complaints of mental problems. *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003) (quoting *Gwathney v. Chater*, 104 F.3d 1043, 1045 (8th Cir. 1997).

As Price contends, evidence in the record indicates that she has complained of side effects from medication, and she has several times reported difficulty with sleeping throughout the day. The medications Paxil and Verapamil caused constipation. (Tr. 204, 301.) However, Verapamil did not cause side effects at a lower dose, and Paxil was effective in reducing anxiety, but disrupted her sleep. (Tr. 199, 311, 204.) Sleep deprivation exacerbated Price's migraines. (Tr. 302.) Price also complained of sleeping a great deal during the day. (Tr. 204, 171, 172, 311.) The ALJ's conclusion about the record not supporting Price's subjective complaint of daytime sleepiness, possibly caused by side effects from medication, was in error.

The ALJ's determination that Price's lack of psychiatric care negatively affects her credibility was also an error. "[F]ederal courts have recognized a mentally ill person's noncompliance with psychiatric medications can be, and usually is, "the result of [the] mental impairment [itself] and, therefore, neither willful nor without a justifiable excuse." *Pate-Fires v. Astrue*, 564 F.3d 935, 945 (8th Cir. 2009) (citations omitted). In this case, as in *Pate-Fires*, there is evidence in the record that Price's refusal to take the prescribed medication for delusions was a manifestation of her disorder. Dr. Newman noted that Price was afraid to take medication that would "take the stalkers away" because Price believed they were real, and it would be dangerous not to notice them. (Tr. 199.) In fact, Dr. Newman related a long history of Price refusing mental health referrals and medication before Price attempted suicide. (Tr. 205.) The fact that Plaintiff could work

18

with these symptoms until it finally drove her to suicide does not negatively affect the credibility of her subjective complaints. After her suicide attempt, Price finally agreed to treatment with antidepressants, and ultimately found some relief from Paxil. However, Price apparently continued to believe the stalkers are real, and she challenged the words "delusional and paranoid" in her medical records. (Tr. 422.) Thus, it is not surprising that she refused to take psychotropic medication.

The record as a whole very much supports Price's anxiety and fear over being stalked outside the home and no treatment provider who encountered Price questioned whether she experienced this fear. (Tr. 172, 313, 318, 333-34). Her fear of stalkers explains how Price is able to function in her daily activities when she stays home, but, as Plaintiff contends, it does not translate to her ability to hold a job outside the home.

Based on the record as a whole, the ALJ did not properly evaluate Price's subjective complaints about daytime sleepiness, stress, and fear of stalkers. On remand, the ALJ should consider these symptoms and how they affect Price's residual functional capacity, and this must be incorporated into Price's RFC. Furthermore, the testimony of a vocational expert is only supported by substantial evidence if it was based on a hypothetical question that included all of the claimant's impairments and functional restrictions. *Grissom v. Barnhart*, 416 F.3d 834, 837 (8th Cir. 2005). Based upon the above discussion, the ALJ's RFC decision is not supported by substantial evidence, and additional expert testimony will be required on remand.

**IV.    CONCLUSION AND RECOMMENDATION**

Although the record was sufficiently developed by the ALJ, the ALJ erred by failing to consider the record as a whole in his analysis of Price's treating physicians'

opinions of her headaches. Furthermore, the ALJ made several errors in his credibility analysis, and additional proceedings are necessary to properly determine Price's residual functional capacity, and ability to perform work in light of that residual functional capacity.

### IT IS HEREBY RECOMMENDED THAT:

1. Price's Motion for Summary Judgment be GRANTED IN PART for remand for further proceedings consistent with this Report and Recommendation, in accordance with sentence four of 42 U.S.C. § 405(g), and DENIED IN PART for award of benefits (Doc. No. 8);

2. Defendant's Motion for Summary Judgment (Doc. No. 19) be DENIED.


Dated:  July 6, 2009                              s/ *Jeanne J. Graham*
                                                  JEANNE J. GRAHAM
                                                  United States Magistrate Judge


### NOTICE

Pursuant to Local Rule 72.2(b), any party may object to this report and recommendation by filing and serving specific, written objections by **July 20, 2009**. A party may respond to the objections within ten days after service. Any objections or responses filed under this rule shall not exceed 3,500 words. The District Court shall make a de novo determination of those portions to which objection is made. Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the United States Court of Appeals for the Eighth Circuit.